UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KENDALL JITTA,

                               Plaintiff,                       **MEMORANDUM AND
ORDER**

                -against-                              CV 09-2868 (ARL)

P.O. MARK POLSTEIN, P.O. ROWLEY
and COUNTY OF NASSAU,

                              Defendants.
-------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        Before the court is the defendants' motion for summary judgment. For the reasons set

forth herein, the motion is granted. The court declines to exercise pendent jurisdiction over any

remaining state law claims.

## BACKGROUND

        The plaintiff, Kendell Jitta ("Jitta"), commenced this civil rights action on July 6, 2009,

seeking damages based on the plaintiff's arrest for criminal trespass at the apartment of his

former girlfriend, Shala Mohammed ("Mohammed") in July 2008. On March 29, 2010, the

plaintiff filed an Amended Complaint, alleging (1) false arrest/false imprisonment, (2) malicious

prosecution, (3) negligence by all defendants, including a Monell claim against the defendant

Nassau County, (4) a violation of the Fourth Amendment by virtue of an improper search, and (5)

due process and equal protection violations of the Fourteenth Amendment and New York State

law. On June 4, 2010, the parties consented to the undersigned's jurisdiction. On January 20,

2011, the defendants filed the instant motion for summary judgment.

Jitta was romantically involved with Mohammed for a number of years.[1]  Def. 56.1 Stmt.

¶¶9-15.  In 2008, Mohammed was living at 98 Sewanee Avenue, Elmont.  *Id.* at ¶13.  Jitta had

lived at 98 Sewanee Ave. with Mohammed for some period of time, but was told to move out in

or about March 2008 because Mohammed believed he was seeing another woman.[2]  *Id.* at ¶*15.*

According to Mohammed, when Jitta moved out, he took all of his belongings with him and gave

her back his key to the apartment.  *See* Mohammed Tr. 37:12-23; Defs. 56.1 Stmt. ¶16.  Jitta

claims he retained a key and used it to enter the apartment on several occasions after he moved

out.  Pl. 56.1 Stmt. ¶3.  Jitta states he left behind some tools and clothing.  Def. 56.1 Stmt. ¶17;

Pl. 56.1 Stmt. ¶4.

On July 10, 2008, Mohammed awoke to find Jitta in her apartment without her

permission and without knowing how he had gotten in.  Def. 56.1 Stmt. ¶18-19.  Jitta claims that

Mohammed knew he was coming but had expected him earlier, and that he let himself in with his

key.  Pl. 56.1 Stmt. ¶¶5-6.  Mohammed says that she twice told Jitta to leave the apartment, but

he refused.  An argument ensued and Jitta struck her on the left ear breaking her eardrum before

he ran out the door.  Def. 56.1 Stmt. ¶¶ 20-21, Pl. 56.1 Stmt ¶7.  After Jitta left, Mohammed

called 911 and reported that Jitta had hit her.  Def. 56.1 Stmt. ¶ 22.  In response to her 911 call, a

police car and ambulance were dispatched to Mohammed's apartment.  Mohammed later refused

---

[1]The facts set forth in this decision are taken from the uncontested facts set forth in the defendants' Rule 56.1 statement.  Where necessary, the court has noted the plaintiff's disagreement with the defendants' statement of certain facts.

[2]The parties disagree on certain details of why the relationship between Jitta and Mohammed ended.  Defs. 56.1 Stmt. ¶15;  Pl. 56.1 Stmt. ¶¶1-2.

medical attention.  Pl. 56.1 Stmt. ¶ 8.

Jitta acknowledges that Mohammed was emotional and jealous during their encounter in the apartment, but that he left without any physical confrontation, and there is no evidence of a broken eardrum.  Pl. 56.1 Stmt. ¶ 7.

## A.  Officer Rowley

The defendant, Police Officer Alexander Rowley ("Rowley"), responded to Mohammed's apartment after receiving a report of a domestic incident at 98 Sewanee Avenue that evening. Def. 56.1 Stmt. ¶24.  He arrived at the scene one minute after receiving the radio transmission. Def. 56.1 Stmt. ¶ 25.  Mohammed let Rowley into the apartment, where he interviewed her.  Def. 56.1 Stmt. ¶ 26.  Mohammed told Rowley that Jitta had entered her apartment without permission, refused to leave, and punched her in the face.  Def. 56.1 Stmt. ¶ 27.  Rowley entered this information in a Domestic Incident Report.  *Id.*

Jitta refers to Rowley's deposition testimony, in which Rowley stated that when he responded to the incident, Mohammed was crying and it was difficult to put her story together, but he eventually pieced together that she had woken in the night, found Jitta in her apartment, had a verbal dispute about their getting back together, asked him to leave, and that he struck her before he left the apartment.  Pl. 56.1 Stmt.¶9.  Jitta notes that Mohammed later specifically denied that she told police officers that Jitta had "punched her."  Pl. 56.1 Stmt. ¶ 10.  In fact, Mohammed testified at her deposition that she had never used the word "punch," but instead said "hit."  Defs. Ex. A, Mohammed Tr. 62:7-21; 72:2-5.

Despite having called the police, Mohammed asked the police to take no action against Jitta and refused to sign the Supporting Deposition in the Domestic Incident Report.  Mohammed

explained to Officer Rowley that she wanted to avoid reprisal, specifically citing concern for her brother and noting that Jitta knew people in Trinidad who could "do things to her."[3] Def. 56.1 Stmt. ¶28. At her deposition, Mohammed testified that she told the police she did not want to press charges, but she did not know why. Defs. Ex. A, Mohammed Tr. 47:18-21. Jitta acknowledged telling the police that she did not want repercussions and that signing the supporting deposition would have "led [Jitta] to be vindictive," and that she did not want to deal with that. She denied telling the police that Jitta "had people in Trinidad" who would harm her if she cooperated. Instead, she said that she told Rowley that Jitta "knows people everywhere," and that she didn't want things "coming back" to her or her family or her younger brother. Defs. Ex. A, Mohammed Tr. 84:3 -85:3.

In the face of Mohammed's refusal to sign, Rowley, acting on behalf of the State of New York, signed the Supporting Deposition in order to file the Report and process Jitta's arrest. Def. 56.1 Stmt. ¶29[4]. Rowley testified at his deposition that he felt obligated to proceed with the complaint because "sometimes the victim is so afraid of the assaulter that they don't want to sign." Defs. Ex. C, Rowley Tr. at 37:18. Rowley further testified that it is his understanding of the rules that once a person calls the police for domestic harassment and says that her boyfriend or husband hit her, it is a "must-arrest situation", however verbal arguments are not "must-

---

[3]Jitta adds that when Rowley testified at his deposition, Rowley said that although Mohammed said she was afraid that Jitta knew people in her native country who could "do things to her," she "was unclear as to whom they were and what [their] connections were." Pl. 56.1 Stmt.¶¶11-12; Rowley Dep. at 21:17.

[4]Jitta appear to disputes statement 29 at paragraphs 15 and 16 of his 56.1 Counterstatement, but the statements Jitta has added have no bearing on defendants' paragraph 29. They appear to address statements made by the defendants in subsequent paragraphs and will be noted there.

arrest" situation. Defs. Ex. C, Rowley Tr. at 37:18-39:9; Pl. 56.1 Stmt. ¶13. Mohammed also testified that the officers at the scene told her that the County had to press charges because a call had been made to 911. Pl. 56.1 Stmt. ¶14 (citing to Def. Ex. A, Mohammed Tr. 48:8-17).

Rowley then prepared a Misdemeanor Complaint-Domestic Violence form, entitled "DV-85," charging Jitta with criminal trespass in the second degree. Defs. 56.1 Stmt. ¶30. Rowley never met Jitta and was not involved in the physical processing of his arrest. Defs. 56.1 Stmt. ¶¶ 31-32. Nor did Rowley conduct a strip or body cavity search of Jitta. Defs. 56.1 Stmt. ¶¶ 33.

### B. Detective Rogan

Non-party detective Edward Rogan also responded to the Sewanee Avenue address at about 1:30 a.m., the morning of July 11, 2008. Defs. 56.1 Stmt. ¶ 35. When Rogan arrived, he spoke to Rowley, who repeated Mohammed's allegations of finding Jitta in the apartment, telling him to leave, and the "ensuing scuffle." Defs. 56.1 Stmt. ¶ 36. After speaking with Rowley, Rogan spoke to Mohammed for about half an hour. Defs. 56.1 Stmt. ¶ 37. Mohammed told Rogan that she woke up and found Jitta in her bathroom, and he had no right to be there. Mohammed also told Rogan that they got into a pushing match and Jitta left. *Id.* Defs. 56.1 Stmt. ¶ 37. Rogan Tr. 11:9-24. The plaintiff adds that Rogan also testified that Mohammed had told him that she had last seen Jitta two weeks earlier, she had been away in Virginia, and she had sent Jitta a text telling him when she would return. Pls. 56.1 Stmt. ¶ 15 (citing to Defs. Ex. G, Rogan Tr. 11:8-12:5; 21:21-22:14). Rogan noted that Mohammed did not appear to have sustained any significant injury. *Id.* Rogan, confirmed that Mohammed refused to sign the forms because she did not want Jitta arrested. Pls. 56.1 Stmt. ¶ 16. Rogan made handwritten and typed notes of his interview of Mohammed. Defs. 56.1 Stmt. ¶ 38.

Rogan classified the offense by Jitta to be criminal trespass, in that he entered the apartment without permission and stayed there.  Defs. 56.1 Stmt. ¶ 39; Pls. 56.1 Stmt. ¶ 39.  Jitta notes however that Rogan testified at his deposition that Mohammed had told him that the door to the apartment did not lock properly and he thought that someone could open the door and walk in.  Pls. 56.1 Stmt. ¶ 18 (citing to Rogan's Dep. Tr., Defs. Ex. G, 12:21-20:10.  Jitta also notes that Rogan saw no sign of forced entry.  *Id.*  Mohammed denied ever telling the police that the door did not close properly and said that the door was not open and the only way to gain entry would be to use a key or jimmy the lock.  Pl. 56.1 Stmt. ¶ 19 (citing Mohammed Dep. Tr., Defs. Ex. A, 88:11-90:25.

The next morning, the case was assigned to defendant Detective Polstein and Rogan played no further part in the investigation.  Defs. 56.1 Stmt. ¶ 40.

## C.  Detective Polstein

The investigation was assigned to the defendant Mark Polstein ("Polstein") on the morning of July 11, 2008.  Defs. 56.1 Stmt. ¶ 42.  Detective Rogan turned over his notes to Polstein who reviewed the various domestic incident forms that had been prepared.  Defs. 56.1 Stmt. ¶¶ 42-43.  Ironically, Polstein knew Jitta having been his karate instructor years earlier.  Defs. 56.1 Stmt. ¶ 44.  Defs. 56.1 Stmt. ¶ 44.

On either July 11 or 12, Polstein spoke to Jitta's mother and told her this was a "must arrest" situation.  Defs. 56.1 Stmt. ¶ 45.  On July 11, Polstein called Jitta and told him that he would have to come to the Fifth Precinct to be arrested.  Defs. 56.1 Stmt. ¶ 46; Pls. 56.1 Stmt. ¶ 46.  Jitta agreed to turn himself in.  Defs. 56.1 Stmt. ¶ 46.  Jitta told Polstein that he had in fact entered Mohammed's apartment but had used his key and that he did not hit her.  Pls. 56.1 Stmt.

¶ 24.  Polstein told him that he would be charged with trespass and assault.  Pl. 56.1 Stmt.¶¶ 20-22.  As it happened, Jitta was charged only with trespass.

**D.  Jitta's Processing**

On July 12, 2008, at 4:30 p.m., Jitta went to the Fifth Precinct and notified the Desk Officer that he was turning himself in to Polstein.  Defs. 56.1 Stmt. ¶ 47.  Polstein came downstairs, took Jitta's property and walked him upstairs to the Squad Room.  Defs. 56.1 Stmt. ¶ 48.  The defendants contend that Polstein did not question Jitta about the encounter with Mohammed.  Defs. 56.1 Stmt. ¶ 49.  Jitta contends that Polstein did question him and he told Polstein he had entered with keys, asking how he could be charged with trespass if he had a key and Mohammed knew he was coming.  Pl. 56.1 Stmt. ¶¶ 23-25.

Jitta was charged with Criminal Trespass in the Second Degree under Penal Law §140.15, a misdemeanor.  Defs. 56.1 Stmt. ¶ 50. [5] He was handcuffed, fingerprinted, photographed and placed in a cell.  Defs. 56.1 Stmt. ¶ 51.  Jitta claims that when he went to use the bathroom while at the 5th precinct, he was escorted by two unidentified police officers who had him remove all his clothing and then asked him to bend over so they could examine his anal area. Pl. 56.1 Stmt. ¶ 27.  Jitta testified at his deposition that he was required to remove his boxer shorts and that the officers touched his buttocks, spreading his cheeks but did not touch his anus.  Ex. B, Jitta Tr. 165:8-172:13.  According to Jitta the unidentified police officers who forced him to strip and who examined his buttocks told him they were doing it because it was "what they had to do." *Id.*, citing Def. Ex. B, Jitta Dep. Tr. 161-167.

---

[5]  Penal Law §140.15 provides that a person is guilty of criminal trespass ... when he knowingly enters or remains unlawfully in a dwelling.

On July 12, 2008 at 11:45 p.m., Jitta was questioned about his physical condition for purposes of completing form PDCN 79SJ in connection with his arrest. Defs. 56.1 Stmt. ¶ 57. He was asked if he was in good health and he answered yes. *Id.* When asked if he needed a doctor, he said no. *Id.* He was asked if he had any injuries, to which he answered no. *Id.* Jitta signed form PDCN 79SJ form, certifying that his answers were true. *Id.* On July 13, 2008 Jitta provided the same responses on a second PDCN 79SJ prepared in connection with his transport from the Fifth Precinct to the Nassau County Police Department pending presentation for a bail hearing. Defs. 56.1 Stmt. ¶ 58.

Jitta was transported to Nassau County District Court on July 13, 2008 and his bail was set at $500. Defs. 56.1 Stmt. ¶¶ 59-60. He was then transported to the Nassau County Correctional Center. Defs. 56.1 Stmt. ¶ 61. On the evening of July 13, he was bailed out and released. Defs. 56.1 Stmt. ¶ 62. On September 29, 2008, the District Attorney's Office moved to dismiss the criminal misdemeanor charge against Jitta under Criminal Procedure Law §170.30(1)(f), because complainant Mohammed refused to cooperate with the District Attorney's investigation. Defs. 56.1 Stmt. ¶ 63. Jitta says that his attorney, Garnett H. Sullivan, moved to dismiss the accusatory instrument due to legal insufficiency by motion dated August 26, 2008. The court dismissed the criminal action on the prosecutor's motion on September 29th. P1 Stmt. ¶ 26.

### E. Jitta's Strip Search Contention

The defendants maintain that no routine strip search or body cavity search was conducted of Jitta by any of the named defendants, or any Nassau police officer, nor would such

a search have been undertaken pursuant to any policy of Nassau County. Defs. 56.1 Stmt. ¶ 52-56. The defendants have submitted as evidence the strip search policy of the Nassau County Police Department which states that strip or cavity searches may not be routinely undertaken and can only be conducted with the specific approval of a superior officer who is required to prepare a report of the search undertaken and the basis for it. According to Department policy, a strip search or cavity search is authorized only "when there is a reasonable suspicion that a person is concealing a weapon, dangerous instrument, contraband, evidence of an offense, or any other instrument, article or substance that may facilitate escape, and there is no other reasonable method to obtain these items unless a strip search is undertaken without delay." Defs. Ex. J.

The defendants have also submitted an affidavit from Jeanne A. Gans, formerly a Detective-Sergeant with the Nassau County Police Department's Fifth Precinct. Detective Gans conducted an investigation into Jitta's complaint that he was forced to strip and subjected to an anal examination. Her investigation failed to reveal any report or other evidence that Jitta was subjected to either a strip search or a body cavity search by any police officers. Gans Aff. at ¶2. Instead, Gans asserts that Jitta was subjected to a routine search incident to his arrest, which did not include any rearrangement, removal or adjustment of his underwear such as to expose his genitals, buttocks or anus. Gans Aff. at ¶8.

## DISCUSSION

### A. Summary Judgment Standards.

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, the burden of proof is on the moving party to show that there is no genuine issue of material fact. *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)(citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In making this determination, the court must view all of the evidence "in the light most favorable" to the non-movant. *Breland-Starling v. Disney Pub. Worldwide*, 166 F. Supp. 2d 826, 829 (S.D.N.Y. 2001)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). In addition, the court must resolve all ambiguities and draw all inferences in favor of the party opposing the motion. *Ackerman v. National Financial Systems*, 81 F. Supp. 2d 434 (E.D.N.Y. 2000). Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56; *and see Liberty Lobby*, 477 U.S. at 250.

In opposing the motion, the nonmoving party may not rely upon "mere conclusory allegations, speculation, or conjecture." *Ackerman*, 81 F. Supp. 2d at 436 (citing *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). However, "if there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable." *Holt v. KMI Continental Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

**B. Jitta's False Arrest/False Imprisonment Claim**.

Jitta's first cause of action is for false arrest and false imprisonment. False arrest and false imprisonment claims can be evaluated as a single claim. *See Brodie v. Fuhrman,* 2010 WL

1189347, *5 n.14 (E.D.N.Y. Mar. 29, 2010) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995)). False arrest claims are analyzed under the law of the state in which the arrest occurred, here, New York. *See Jaegly v. Couch,* 439 F.3d 149, 151-52 (2d Cir. 2006). The elements of false arrest in New York are: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir. 2003). Privilege may be established by the existence of probable cause for the arrest, so that under New York law, the existence of probable cause is an absolute defense to a false arrest claim. *Jaegly*, 439 F. 3d at 149.

Probable cause to arrest "exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Williams v. Town of Greenburgh,* 535 F.3d 71, 79 (2d Cir. 2008)(internal citations and punctuation marks omitted). The inquiry focuses on the facts known to the arresting officer at the time of the arrest and looks to the totality of the circumstances. *See Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994). Probable cause can exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Id.* Here, there was probable cause to arrest Jitta.

The defendants relied on Mohammed's statements to Rowley and Rogan as set down in the Domestic Incident Report and in Rogan's notes, and on her demeanor on the night of the incident. Mohammed stated several times that Jitta entered her apartment without her permission, and would not leave when she told him to, which constitutes the misdemeanor of

11

criminal trespass under C.P.L. §140.15. ("A person is guilty of criminal trespass in the second degree when he knowingly enters or remains unlawfully in a dwelling.") She was crying and told Rowley and Rogan that Jitta had hit and/or pushed her.

Absent circumstances that raise doubt as to a victim's veracity, a victim's report of a crime is generally enough, by itself, to establish probable cause. *Koester v. Lanfranchi,* 288 Fed. Appx. 764, 766 (2d Cir. 2008)(internal quotation marks and citations omitted). Here, Jitta argues, there were serious questions about Mohammed's veracity, as evidenced by her refusal to sign the report. He suggests that her reason for not signing was the fact that the report provided that any false statements were punishable as crimes, but there is no evidence whatsoever to support that inference. Rather, as Mohammed testified at her deposition and as she told the police at the time, she would not sign because she did not want Jitta arrested and because she feared that some harm would come to her or her family if she made him angry and vindictive. It was reasonable for the officers to believe that explanation for her refusal to sign, and nothing in the record gives rise to an inference to the contrary. The issue is not whether she truly was afraid of Jitta's potential retribution, but whether the police officers reasonably believed her to be. Overall, the question is whether, "considering *all* facts known by the defendants, they had enough reasonably trustworthy information . . . to warrant a person of reasonable caution" to believe that Jitta had committed a crime. *Koester*, 288 Fed. Appx. at 767 (internal citations and quotation marks omitted). They did.

Jitta further argues that there was "no independent corroborative evidence of the crime to support the putative victim's veracity or reliability in light of her refusal to sign to the truth of the statement," but a finding of probable cause does not require "corroborative evidence." "It is well

settled that police officers have probable cause to arrest if they receive information from a complaining victim or other witness who they reasonably believe to be telling the truth." *Little v. City of New York,* 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007); *see also Brodie*, 2010 WL 1189347 at *5 (in general, the veracity of complaints from citizens "who are the victims of the very crimes they report to the police is assumed")(citations omitted). "Courts have thus dismissed false arrest claims where the plaintiff was arrested based solely on the complaint of one purported victim and the plaintiff failed to allege facts suggesting that the victim should have appeared unreliable to a reasonable police officer." *Sheikh v. City of New York,* 2008 WL 5146645, *6 (E.D.N.Y. Dec. 5, 2008)(citations omitted). "While an unsigned complaint in combination with other indicia of unreliability could support the conclusion that probable cause was lacking" such circumstances are not present here. *Id.*

Jitta claims that he told Polstein that he entered the apartment with a key and with Mohammed's foreknowledge that he was coming, but conflicting accounts between the victim and the arrestee do not vitiate a finding of probable cause. *Curley ,* 268 F.3d at 70. Once a police officer has a reasonable basis for believing that there is probable cause, "he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Id*. Further, "before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted." *Id*. Finally, Rowley and Polstein acted in accordance with Police Department Procedure in arresting plaintiff under OPS 2131, which requires police officers to make arrests in cases of domestic violence after determining reasonable cause. *See* Defs. Ex. D, p.1. Based on all the circumstances, Rowley and Polstein both reasonably relied on Mohammed's statements and her demeanor as

constituting trustworthy information to support the decision to arrest Jitta.  Probable cause existed for the arrest, and the false arrest/false imprisonment claim is dismissed on both federal and state grounds.

## C.  Jitta's Malicious Prosecution Claim.

The plaintiff's second cause of action is for malicious prosecution.  To prevail on a malicious prosecution claim under section 1983, a plaintiff must show a deprivation of his liberty under the Fourth Amendment, and must establish the elements of a state law malicious prosecution claim.  *See Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir. 2002).  Under New York law, the plaintiff must demonstrate: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice."  *Pierre v. City of New York,* 2007 WL 2403573, *10 (E.D.N.Y. Aug. 17, 2007); *see also Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir. 2003).  The defendants argue that the malicious prosecution claim must be dismissed because Jitta cannot satisfy the second, third and fourth elements, but the court need look no further than the third element - probable cause.

The "existence of probable cause is a complete defense to a claim for malicious prosecution in New York."  *Manganiello v. City of New York,* 612 F.3d 149, 161-62 (2d Cir. 2010(internal citations omitted).  This is so unless the officer, "following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause."  *Pierre,* 2007 WL 2403573 at *11, n.11(citations omitted.  Nothing in the record even suggests such circumstances, and the finding of probable cause thus requires the dismissal of the

malicious prosecution claim on both federal and state grounds.[6]

Moreover, there is simply nothing in the record to even remotely support a finding of malice on the part of the defendants. Actual malice "does not require a plaintiff to prove that the defendant was motivated by spite or hatred," but instead that he initiated the criminal proceeding "due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir.1994). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *See Martin v. City of Albany*, 42 N.Y.2d 13 (1977). As set out more fully above in connection with the probable cause analysis, there was ample basis for Jitta's arrest and he has not identified any exculpatory information that emerged either before or after his arrest. Indeed, the record reflects that, if anything, the defendants took a cautious approach charging Jitta only with trespass. Under these circumstances, no reasonable jury would find the actual malice element is met because there is no evidence that the defendants were motivated by "something other than a desire to see the ends of justice served." As such, Jitta's § 1983 and state-law malicious prosecution claims fail.

D. **Jitta's Negligence/Monell Claims.**

The plaintiff's third cause of action alleges negligence on the part of both the individual defendants and the County, with the plaintiff claiming that the County engaged in negligent hiring, training, retention and supervision of police officers. Am. Compl. ¶¶27-29. As to the individuals, the plaintiff asserts that Rowley and Polstein "failed to perform their duties as a reasonably prudent and careful police officer would have done under similar circumstances . . .," in other words, that they falsely arrested and maliciously prosecuted Jitta. They did not do

---

[6]The finding of probable cause renders the need for a qualified immunity defense moot.

so and any negligence claims against them based on those causes of action are dismissed under both federal and state law.

As to the County, under section 1983, a municipality is liable on a Monell claim "only if the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers or is conducted pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels." *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir. 2003)(internal citations and punctuation marks omitted). To prevail on a Monell claim that challenges a municipal policy or custom, a plaintiff must plead and prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subject to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983). The policy, practice or custom at issue must have been "the moving force" behind "the constitutional violation." *Sarus v. Rotundo,* 831 F.2d 397, 400 (2d Cir. 1987). Here, Jitta argues that "it appears" that the "must arrest" policy regarding domestic disputes was the "moving force" behind his arrest. While the "must arrest" policy may have played some part in the decision to arrest Jitta, it was not, on the record before the court, the sole basis for the arrest. Probable cause existed independent of that policy, and Jitta suffered no constitutional harm. Indeed, the written policy itself requires reasonable cause, providing that "arrests are made when there is reasonable cause to believe that offenses have been committed, [and] reasonable cause is determined in the same way it is for all other offenses." Defs. Ex. D, p. 1 "Policy." Because the officers acted with probable cause, no constitutional violation occurred, and there is no evidence whatsoever that the County engaged in negligent hiring, training or supervision. Thus, the Monell claim against the

County is dismissed.

**E. Jitta's Claim Based on Unconstitutional Search.**

The plaintiff asserts, in his Amended Complaint and as an additional fact in his 56.1 Counterstatement, that he was forced to strip, expose his buttocks, and that police officers forced him to bend over so they could examine and/or inspect his anal area in violation of federal law and his state law right to privacy. Am. Compl., ¶¶30-36. He does not specify who the police officers were who did this to him, and does not claim that Polstein or Rowley conducted the search. Thus, his only cause of action in this respect is based upon a Monell claim against the County for failing "to adequately supervise and train their police officers regarding the constitutional standards for searches of this nature, and fail[ure] to adequately discourage such constitutional violations of the constitutional rights of citizens." Am. Comp., ¶34.

In regard to this claim, and as noted above, the defendants rely on Departmental policy concerning the conduct of strip and or cavity searches, as well as the Affidavit of Detective Jeanne Gans, who conducted an investigation into the claim that Jitta was strip searched or body-cavity searched. She states that her investigation established that Jitta was "never subjected to either a strip search or a body cavity search by any police officers, as those terms are defined by Nassau County Police Department Manual under Rules, Article 17... " Gans. Aff., ¶¶ 1, 4. Jitta alleges that he was strip searched as a matter of routine and that this search was unconstitutional because it was not supported by a reasonable suspicion that he was concealing contraband.

The defendants argue that, in her affidavit, Detective Gans established beyond question that plaintiff was never strip-searched or cavity searched while in police custody. The question of whether Jitta was actually strip searched as he claims, raises an issue of fact that cannot be

resolved on the record before the court. But the factual dispute as to the form of search conducted, does not prevent the award of summary judgment on this cause of action. Jitta has failed to raise an issue of material fact as to whether the County had a policy or practice requiring or even allowing strip searches or cavity searches of arrestees with anything less than a "reasonable suspicion." [7] The County's policy that all strip and cavity searches must be supported by reasonable suspicion and authorized by a superior officer stands uncontradicted by the evidence. Thus, Jitta's complaint that he was strip searched by two unidentified officers, even if true, standing alone, simply does not suffice to establish a County policy.

It is now well established that Monell liability does not rest on a *respondeat superior* theory, and a municipality can only be found liable under section 1983 where the municipality itself causes a constitutional violation. *See Monell*, 436 U.S. 658, 691 (1978). As noted *supra*, under section 1983, a municipality is liable on a Monell claim "only if the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers or is conducted pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels." *Anthony* 339 F.3d at 139. And, the policy, practice or custom at issue must have been "the moving force" behind "the constitutional violation." *Sarus,* 831 F.2d at 400. Here, Jitta asserts that the County maintains a requirement that an arrestee strip as "a routine condition prior to [his] being able to use the bathroom as an arrestee at the Fifth precinct," and that such a County policy is unconstitutional. Pl. Mem. in Opp. at 17. In

---

[7] Jitta does not, nor could he, contend that the County's strip search policy to the extent it is based upon a reasonable suspicion is unconstitutional. See. Weber v. Dell, 804 F 2d 796, 802 (2d Cir. 1986).

an effort to bootstrap his Monell claim, Jitta points to the deposition testimony of Officer Polstein, who testified that if he escorted a prisoner to the bathroom, he would, subject to the arrestee's demeanor and his own level of comfort, ask them to remove their belts, shoes, socks, pants, shirt, and jewelry to verify that he was not concealing anything in his clothing. Defs. Ex. K, Polstein Dep. Tr. 60:8-61:23. When asked if he was "permitted to remove the person's clothing," he responded: "If that's what I need to do to ensure that they don't have anything on them, then, yes." Id. 61:17-23. Polstein, Jitta argues, is a sixteen year employee of the Nassau County Police Department who "was certainly familiar with the practices and procedures of the Department." Pl. Mem. in Opp. at 17. Jitta also says that the unidentified police officers who forced him to strip and who examined him told him they were doing it because it was "what they had to do." *Id*., citing Def. Ex. B, Jitta Dep. Tr. 161-167.

But Polstein never testified that he would remove a person's underwear as a matter of course. Moreover, Polstein's statement that he would conduct a strip search if he felt it was needed is at best ambiguous and not inconsistent with the County's policy of authorizing strip searches based upon a reasonable suspicion. Thus, other than Jitta's claim that he was told by an unidentified officer that he was strip searched because "it was what they had to do", there simply is no evidence before this court to support Jitta's claim that strip searches were routinely performed on all arrestees or on all arrestees who wished to use the bathroom. Even if Jitta was strip searched, a municipal policy cannot be inferred from a single instance of police misconduct where there is no independent proof of the existence of a policy or custom. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal

policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985); *see also In re Dayton,* 2011WL 2020240 (S.D.N.Y. March 31, 2011) (citing cases).   Here, there is no such evidence and no discussion at all of a municipal policymaker.  Thus, the Monell claim based on unconstitutional search is dismissed.

To the extent that the plaintiff intended an independent state law claim based on New York's right to privacy laws or the New York State constitution (*see* Amended Complaint at ¶33), the court dismisses that claim.  *See infra*.

**F.  Jitta's Fifth Cause of Action.**

In their memorandum of law in support of the motion, the defendants argue that the fifth cause of action, which is "a composite" of the first four causes of action phrased as violations of the due process and equal amendment clauses, should also be dismissed.  The court agrees.  To the extent that Jitta attempted to raise these additional causes of action, there are inadequate pleadings and no evidence or legal argument to support such claims.  Indeed, Jitta raises no opposition to the dismissal of this cause of action in his papers, and it is dismissed.

**G.  Pendent Jurisdiction of State Law Claims.**

Having dismissed plaintiff's federal claims, the court must decide whether it is appropriate to exercise pendent jurisdiction over any state law claims that Jitta has asserted. "Federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment."  *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986).  The Second Circuit has further instructed that "in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience,

fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)). As none of these factors favors retaining jurisdiction, the court declines to exercise pendent jurisdiction over any remaining state law claims. As noted *supra*, any state law claims of false arrest or imprisonment, malicious prosecution, or negligence have been dismissed. The fourth cause of action, based on an improper search, has also been dismissed on federal grounds, but the Amended Complaint references state law in regard to that claim. To the extent that Jitta bases the fourth cause of action on state law, that claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted. To the extent that Jitta bases the fourth cause of action on state law, that claim is dismissed without prejudice. The clerk of the court is directed to close this case.

Dated: Central Islip, New York
     September 13, 2011

                                    /s/
                             Arlene Rosario Lindsay
                             United States Magistrate Judge